Arne THIRUP and Pauline
Thirup, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 73–2351.

United States Court of Appeals,
Ninth Circuit.

Dec. 23, 1974.

George E. Link, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for appellants.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before ELY and WALLACE, Circuit Judges, and JAMESON,* Senior District Judge.

## OPINION

ELY, Circuit Judge:

This is a tax case in which Arne and Pauline Thirup, the appellants, claim a $4,755.41 tax credit pursuant to section 38 of the Internal Revenue Code for investments in greenhouses used in their business of growing and selling cut flowers. After concluding that the greenhouses were "buildings" as that term is used in section 48 of the Code, and therefore ineligible for the investment tax credit, the Commissioner of Internal Revenue disallowed the Thirups' claimed credit, and the Tax Court upheld the Commissioner's decision. Arne Thirup, 59 T.C. 122 (1972). We reverse.

During 1966, the year for which their tax liability is in dispute, the Thirups conducted their flower business through a sole proprietorship known as Pajaro Valley Greenhouses [hereinafter, "Pajaro Valley"]. Pajaro Valley's greenhouses were located near Watsonville, California, but the business sold its cut flowers, mainly roses and carnations, throughout the United States.

In 1966, the appellants spent $79,-841.39 to build one new greenhouse (the "principal" greenhouse) and to improve several existing greenhouses by replacing, with more durable fiber glass, the polyethylene plastic that had previously

formed their sides and roofs. The principal greenhouse was a completely enclosed rectangular structure, 400 feet long and 200 feet wide. Its sides and walls were sheets of corrugated fiber glass attached with special nails to a wooden frame consisting of large beams set vertically into the ground and topped with an A-shaped frame roof of lighter wood. The structure had no floor, and the appellants' flowers grew directly from the soil enclosed by the greenhouse. Panes of flat fiber glass, set on metal hinges and framed in wood, formed rows of windows at the top of the structure.

The taxpayers designed and equipped their greenhouses to provide a total interior environment for the commercial production of flowers.[1] The greenhouses shielded the growing plants from the outside elements, but they also did more. Their translucent fiber glass walls, windows, and roofs diffused the sunlight that fell on the flowers so that the flower stems would not bend directly toward the sun but instead would grow long and straight for the commercial market. The greenhouses were equipped with automatic temperature control systems so that when the temperature inside the structures rose above a fixed level, electric motors opened the windows to the outside. If the temperature became too cool, automatic valves in steam pipes located at different levels inside the structures opened to admit heat. Other pipes in the greenhouses carried water and liquid fertilizer to the plants, and generating devices located in each greenhouse released small amounts of carbon dioxide into the interior air. Beneath the greenhouses' soil floors were systems of steam pipes which the appellants periodically opened to sterilize the growing area.

The roses and carnations growing inside Pajaro Valley's greenhouses required a substantial amount of human care. Before young plants were set into

---

* Honorable William J. Jameson, District of Montana, sitting by designation.

1. The Tax Court found that the Thirups' greenhouses might be used to grow other va-

rieties of plants but that they are not economically adaptable to any other purposes. 59 T.C. at 123.

the greenhouse floors, it was necessary for employees to turn and fertilize the soil and mix it with beneficial additives. After the plants had begun to bloom, workers harvested the carnations once, and the roses twice, each day. In addition, the workers routinely moved through the greenhouses to pull weeds, spray chemicals, prune the plants, adjust plant supports, or perform other, similar, tasks.

Pajaro Valley employed from 20 to 25 workers in 1966, at least half of whom spent most of each workday harvesting and caring for the plants inside the greenhouses. The Tax Court found that the greenhouse workers sometimes remained inside the greenhouses for lunch and work breaks, and that during these breaks the workers often rested on tables, benches, and boxes that had been placed in the aisles between flowerbeds and along the greenhouse walls for storing tools and affording workers access to the tops of tall plants. Pajaro Valley's other employees normally worked at tasks outside the greenhouses, but during peak seasons some of the "outside" employees were assigned "inside" work. The Tax Court found that the appellants' employees spent approximately half of their aggregate working time inside the greenhouses.

Section 48 of the Internal Revenue Code defines the types of property eligible for the investment tax credit (known as "section 38 property"):

Sec. 48.　　(a) Section 38 Property—

(1) In General.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (*not including a building and its structural components*) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction　.　.　., or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), .　.　.. [Emphasis added].

Here, the Commissioner agrees that the greenhouses are "other tangible property" under subsection 48(a)(1)(B) and that the greenhouses are "used as an integral part of　.　.　. production .　.　." under subsection 48(a)(1)(B)(i). The only dispute between the parties is whether the greenhouses are "buildings," which the parenthetical part of subsection 48(a)(1)(B) declares ineligible for the investment tax credit.[2]

Exercising the authority granted him by section 38(b) of the Internal Revenue Code, the Commissioner has defined the term "building" as the term is used in section 48:

Treas. Reg. § 1.48–1(e). *Definition of building and structural components.*

(1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of

---

2. For the investment credit to be allowed on 100 percent of the cost of "section 38 property," section 46(c)(2) of the Internal Revenue Code requires that the useful life of the property be 8 years or more. For the purposes of the investment credit and this litigation only, the parties have stipulated that the useful life of the greenhouse components will be 8 years or more.

machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

In holding that the appellants' greenhouses were "buildings," the Tax Court relied on the reasoning set forth in Sunnyside Nurseries, 59 T.C. 113 (1972),[3] which was a companion case to *Thirup* and which also involved greenhouses. In *Sunnyside,* the Court applied two tests in deciding that the greenhouses were "buildings" within section 48.

The first test merely involved consideration of the outward appearance of the structures: since the greenhouses looked like buildings, they must be "buildings." This test, which can be called the appearance test, is attractively simple, and it draws some support from the following sentence from the Commissioner's definition: "The term 'building' generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof . . . ." Treas. Reg. § 1.48–1(e)(1). The quoted statement appears in substantially the same form in both of the Congressional committee reports on the investment tax credit. H.R.Rep.No.1447, 87th Cong., 2d Sess. A18 (1962) (1962–3 Cum. Bull. 405,

516); S.Rep.No.1881, 87th Cong., 2d Sess. 154 (1962) (1962–3 Cum. Bull. 707, 858).

 Considering the Congressional history as a whole, however, it is hardly deniable that the intent of Congress in its creation of the investment tax credit was to encourage improvements in the quality and quantity of American industrial products. We think that the appearance test is too imprecise to achieve this Congressional purpose. We note that the other courts that recently have considered the appearance test also have rejected it. *See* Brown-Forman Distillers Corp. v. United States, 499 F.2d 1263, 1271–1272 (Ct.Cl. 1974) (large, warehouselike structures designed to control temperature and humidity for the proper aging of bourbon whiskey are not "buildings"); Melvin Satrum, 62 T.C. 413 (1974) (reviewed by the full Court) (structures specially designed to provide a beneficial environment for chickens in a commercial egg-producing business are not "buildings," despite two dissenting opinions emphasizing, *inter alia,* the structures' appearance). The Commissioner himself has also declined, on occasion, to apply the appearance test. *See,* e. g., Rev.Rul. 359, 1971–2 Cum. Bull. 62 (a facility for the bulk storage of peanuts is not a "building," even though it looks like a building); Rev.Rul. 132, 1968–1 Cum. Bull. 14 (same decision for a facility for the bulk storage of potatoes).

The second *Sunnyside Nurseries* test for determining whether a structure is a "building" within section 48, that of the structure's function or use, derives from another portion of section 1.48–1(e)(1) of the Treasury Regulations: "The term 'building' generally means any structure or edifice . . . the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display or sales space." This statement, too, appears in substantially the same form in the Congressional committee reports. H.R.Rep.No.1447, 87th

---

**3.** *Sunnyside Nurseries* was appealed to our court, but the appeal was dismissed because of the appellant's failure to prosecute his case.

Cong., 2d Sess. A18 (1962) (1962–3 Cum. Bull. 405, 516); S.Rep.No.1881, 87th Cong., 2d Sess. 154 (1962) (1962–3 Cum. Bull. 707, 858).

The Tax Court has written that the quoted portion of section 1.48–1(e)(1) establishes

. . . a functional test which limits slightly the broad scope of our common understanding of "building." Thus, under section 1.48–1(e)(1) . ., the basic definition of "building" is a structure with walls and a roof, but a "building," it is declared, typically provides space for certain purposes. The enumerated purposes . . . are the furnishing of shelter or housing, or of working, office, parking, display, or sales space. These purposes are exemplary and not all inclusive. But . . the definition of "building" [is] limited somewhat to the functions just stated· .· . ..

Robert E. Catron, 50 T.C. 306, 311 (1968) (reviewed by the full Court) (a specialized facility used solely for cold storage of apples is not a "building"). Under the functional test, therefore, the "buildings" that are excluded by the parenthetical part of section 48(a)(1)(B) are structures that provide shelter or housing or furnish working, office, parking, display, or sales space, or exist for another purpose that could be listed with the enumerated purposes without violating the constraining rule of *ejusdem generis.*

■ Abandoning the appearance test, the most recent authorities have adopted the functional test. *See, e. g.,* Brown-Forman Distillers Corp. v. United States, 499 F.2d 1263 (Ct.Cl. 1974); Melvin Satrum, 62 T.C. 413 (1974) (reviewed by the full Court). We thoroughly agree with this more recent approach. The functional test carves out those types of general purpose buildings, such as "apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores," Treas. Reg. § 1.48–1(e)(1), that we think Congress intended to exclude from the investment tax credit. But the test preserves for the credit those specialized structures whose utility is principally and primarily a significantly contributive factor in the actual manufacturing or production of the product itself.

Applying a functional test, the Tax Court found in *Thirup,* and in *Sunnyside Nurseries,* that the amount of employee activity taking place inside the greenhouses indicated that the greenhouses provided working space, one of the enumerated functions of a "building." In *Brown-Forman Distillers, supra,* and *Satrum, supra,* the courts distinguished *Sunnyside Nurseries* on the ground that Sunnyside's employees spent more time inside the greenhouses than, respectively, Brown-Forman's employees spent inside the whiskey warehouses or Satrum's workers spent in the chicken coops.

■ We find the distinction based on the *amount* of human activity unpersuasive. The proper inquiry, which goes to the *nature* of the employee activity inside the structures, is "whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure." Brown-Forman Distillers Corp. v. United States, 499 F.2d 1263, 1271 (Ct.Cl. 1974). *See* Robert E. Catron, 50 T.C. 306, 316 (1968) (reviewed by the full Court).

■ In *Satrum, supra,* employees worked in aisles between the rows of chicken cages· inside the structures to collect eggs, feed chickens, and remove droppings. Workers also spent long periods of time inside the structures removing thousands of chickens that were to be sent to market and replacing those chickens with younger birds. The Tax Court characterized these activities as "merely supportive of, and ancillary to," the purpose of the chickens and expressly found that the structures did not provide working space. 62 T.C. at 417. In our judgment, the activities of the Thirups' greenhouse employees were, without doubt, of the same supportive and ancillary nature as the activities of the workers in *Satrum.*[4] That flowers may re-

---

4. The only employee activity inside the Thirups' greenhouses that was not supportive to the flowers was the workers' lunch and coffee breaks. We think that activity to be insignifi-

quire more human care than chickens is not a sufficient reason for deciding that greenhouses are "buildings" while chicken coops are not.[5]

We conclude that under the functional test, the Thirups' greenhouses do not function as "buildings," as that term is employed in section 48. The greenhouses supply the controlled environment that is essential to the commercial production of more and finer cut flowers, a function neither enumerated in Treasury Regulation § 1.48–1(e)(1) nor sufficiently similar to the enumerated functions to be within their scope.

The decision of the Tax Court is Reversed.

cant. There was no lunchroom or other specialized area inside the greenhouses for the breaks, and the workers rested and ate their lunch in the aisles near their work only for their own convenience. We note that *Sunnyside Nurseries* presented a somewhat different situation than that with which we are here concerned. There the Tax Court found that workers inside the greenhouses wrapped the pots in which plants were growing in decorative foil and then packed the potted plants into boxes for shipment. 59 T.C. 117–118. We express no opinion as to whether that additional activity justifies the Tax Court's *Sunnyside Nurseries* decision.

5. In this regard we agree with the dissenting judges in *Satrum* who believed that the human activity inside the chicken coops was comparable to the human activity inside the greenhouses in *Thirup* and *Sunnyside Nurseries*. Melvin Satrum, 62 T.C. 413, 418–419 (1974) (dissenting opinion of Dawson J., joined by Raum and Drennen, JJ.). (Judge Raum wrote the Tax Court's opinions in *Thirup* and *Sunnyside Nurseries*.)